Norman Benjamin PARSON, Appellant,

v.

The STATE of Delaware, Appellee.

Supreme Court of Delaware.

July 21, 1966.

 

Jackson W. Raysor, of Tunnell & Raysor, Georgetown, and Irving Morris of Cohen, Morris & Rosenthal, Wilmington, for appellant.

William Swain Lee, Deputy Atty. Gen., Georgetown, for the State.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice.

This is an appeal by Norman Benjamin Parson from a conviction of murder in the first degree, without a recommendation of mercy. A mandatory death sentence was imposed. Parson, in his appeal, urges upon us several alleged errors taking place prior to and during his trial which he says were so prejudicial that his conviction must be set aside and a new trial granted. These alleged errors are:

1. The verdict was contrary to and against the weight of the evidence.

2. The trial judge erred in failing to instruct the jury in the light of State v. Opher, 8 W.W.Harr. 93, 188 A. 257, and in instructing as to inferences permitted when a deadly weapon is used.

3. Parson was denied his constitutional right to counsel and, accordingly, his confession was inadmissible in evidence.

4. Parson's confession was involuntary and was therefore inadmissible in evidence.

5. Parson's confession was obtained during a period of unlawful detention and was therefore inadmissible in evidence.

6. The trial judge erred in limiting the use by Parson of psychological and psychiatric testimony.

7. The trial judge abused his discretion in denying a change in venue.

We take up the contention that the verdict was against the weight of the evidence. Since the argument in this respect is based upon the assumption by Parson that his confession is inadmissible in evidence, we will assume its absence in evidence. By other uncontradicted evidence the State proved the following case: [1]

In the early evening of January 31, 1964, Kathleen Rae Maull, a fifteen-year-old girl, was left as a baby-sitter in the home of Mr. and Mrs. Robert C. Zak in a rural area of Sussex County several miles from Rehoboth Beach. At the time, Kathleen was attired in dungarees, a blouse, stockings and leather loafers.

Mr. and Mrs. Zak returned to their home about 10:00 p. m. They entered the front door and found blood on the living room floor and the kitchen floor and walls splattered with quantities of still-wet blood. There was blood also splattered over the kitchen counters, refrigerator and sink. On a counter top was a bloodstained butcher knife. In the kitchen were two straight chairs, not ordinarily there, placed side by side.

The dungarees which Kathleen had been wearing were crumpled on the kitchen table with one nylon stocking hanging from one leg. On a couch in the living room were Kathleen's school books, the coat she had worn to the Zak home, and on the floor by the couch were her shoes.

The back door of the house which entered into the kitchen was standing ajar. This door was never used by the Zaks and was ordinarily kept locked. In point of fact, some time prior to January 31, 1964, Mr. Zak had locked this door and caulked it against the winter winds. The back door had an outside storm door, ordinarily kept bolted, which also stood ajar.

On entering upon this scene Mrs. Zak ran to a bedroom to see to the safety of her infant child while Mr. Zak searched the house and yard for Kathleen. She

was not to be found. The Zaks then called the State Police.

Subsequent police examination of the premises produced a ladies' watch, later identified as Kathleen's, found on the back doorstep. In the front yard near the public road a bloodstained blouse, later identified as Kathleen's, was found. On the kitchen floor were several broken front teeth later identified as Kathleen's. Later on, the police found the panties and bra worn by Kathleen.

Shortly after the police arrived, one of them stopped an automobile passing by. The driver of this car, in response to the Trooper's questions, stated that he had driven past the Zak house on three occasions that evening and, on the last two, had noticed a car parked on the wrong side of the road in front of the Zak house. He identified the car as one belonging to Parson, whom he knew.

Two State Troopers, upon receipt of this information, went to Parson's home where they found the car described by the passerby with Parson in it behind the wheel. There were blood stains on the rear seat and on the cover of the trunk. Parson was ordered to get out of the car, was handcuffed and a tourniquet applied to his right arm to stop the flow of blood from what appeared to be a bad cut on his right hand.

Parson knew the Trooper who handcuffed him, called him by name and said, "I am in a mess of trouble." About five minutes later, during which time the tourniquet was being applied, a State Police Detective arrived and took over the investigation. He got the keys from Parson's car and started to open the bloodstained trunk when Parson said, "She is not in there. She is in a ditch. I will show you where." The three State Policemen and Parson then got in a police car and Parson directed them to a bridge crossing a stream known as Rabbits Ferry where they found the body

1. Person did not testify in his own defense, nor call any witnesses to dispute this evidence.

of Kathleen, lying on her back with her feet toward the center of the stream. The body was nude except for a nylon stocking on the left foot. En route to this scene Parson was asked if she was dead, to which he answered, "Yes." [2]

From an autopsy performed in the early morning of February 1, 1964, it appeared that Kathleen had suffered a massive blow from some blunt instrument across the bridge of the nose which broke the nose, and broke the upper jaw, or maxilla, into a crumbled mass of bone fragments. This blow broke off all of the front upper teeth. In addition, she had been subjected to a severe beating evidenced by numerous bruises and lacerations, as well as two wounds described by the pathologist as stab wounds. Her body was covered with blood and dirt and showed scrapes and abrasions as though it had been dragged along the ground.

The pathologist who performed the autopsy testified that the cause of death was shock, secondary to multiple injuries and concussions, but, in particular, to concussions caused by the massive blow across the nose.

In addition, the pathologist testified that examination of the vaginal area revealed that the labia majora were intact and without injury but smeared with blood, and that the hymen membrane showed a recent laceration and was covered with blood not of a menstrual nature.

The following specimens were obtained by the State Police and turned over to the Federal Bureau of Investigation for laboratory examination: Pubic hair combings from the body of Kathleen; pubic hair combings from Parson; samples of pubic hair from the body of Kathleen; samples of the pubic hair of Parson; a specimen of Kathleen's head hair; scrapings from under the fingernails of Kathleen; scrapings from under the fingernails of Parson; squares cut from the bloodstained floor and

seat coverings of Parson's car; a bloodstained hammer from the trunk of Parson's car; scrapings from the trunk of Parson's car; a blood sample from the body of Kathleen; a blood sample from the body of Parson, to the taking of which he consented in writing; samples of blood scraped from the floor, walls, sink, counters, cabinets and furniture of the Zak home; various articles of clothing worn on January 31, 1964 by Kathleen; and the clothing worn by Parson at the time he was apprehended.

Expert testimony of F.B.I. special agents established that from microscopic examination it is possible to determine whether hair is from a human being or from an animal. If the hair is human, it is possible to tell the race of the individual from whom it originated, i. e., the Caucasian race, the Mongoloid race or the Negroid race. In fact, it is possible to determine from the microscopic examination of hair whether the individual whose hair it is is a mixture of two or all of the three racial classifications. In addition, it is possible to determine the area of the body from which the hair was taken. It is possible also to distinguish the hair of one individual from that of another, and also to determine whether or not the particular hair in question could have originated from a particular individual by comparison of it with a known sample of his hair.

As a result of the examination of the various specimens turned over to the F. B.I. for examination, it was determined that on the samples of stained seat and floor coverings of Parson's car were found samples of light brown hair of Caucasian origin which were identical in all individual microscopic characteristics with the hair sample taken from the head of Kathleen. In addition, similar hairs were found to be on the door trim, refrigerator and cabinet in the Zak kitchen.

2. No other conversation beyond that referred to took place during this period of time between Parson and the officers.

No question was asked Parson by the police except the inquiry as to whether or not she was dead.

In the scrapings of the fingernails of Parson were found to be several blue cotton fibers which were such that they could have originated from the blue jeans worn by Kathleen, which were also examined. Furthermore, an examination of the blue jeans themselves indicated they had been forcibly torn apart.

Examination further revealed light brown pubic hairs of Caucasian origin, many removed forcibly from the body, on the pieces of rear seatcover and floor mat of Parson's car, all of which could have originated from the body of Kathleen. In addition, in the combings of the pubic area of Parson were found numerous light brown pubic hairs of Caucasian origin which could have originated from the body of Kathleen.

From other F.B.I. laboratory examinations it appeared that Parson's blood was Group O while Kathleen's blood was Group A. The examination of the specimens of blood scrapings revealed that the blood on the kitchen floor of the Zak home was Group A; that the blood on the living room floor was Group A; that the blood on the sink and counter top was Group O; that the blood on the refrigerator and walls was Group A; that the blood near the left side pocket of the trousers Parson was wearing when arrested was Group A, while other stains were Group O; that two stains on the panties worn by Kathleen were made by Group O blood, in addition to which there were heavy stains of Group A. The blood on the hammer and of the scrapings taken from the trunk of Parson's car was Group A.

■ By the first count of the indictment Parson was charged under 11 Del.C. § 571 with committing the crime of murder while attempting to perpetrate a rape upon Kathleen Rae Maull. Under the cited Code section, a murder so committed is first degree murder, for which the prescribed punishment is death. In a prosecution for murder under this provision of the statute, it is not necessary for the State to prove that the killing was done with express malice afore-

thought for the statute transfers the premeditated intent of the crime of rape to the homicide. The turpitude of the criminal act attempted supplies the place of deliberate and premeditated malice, and is its legal equivalent. State v. Opher, 8 W.W. Harr. 93, 188 A. 257; 1 Anderson, Wharton's Criminal Law and Procedure, § 251. While the Opher case is a decision of the former Court of Oyer and Terminer, a trial court, we think it properly expresses the law of this state.

As we have pointed out, the recited facts were all proved by the State. They consist largely of circumstantial evidence. Parson says that the above-recited facts, standing alone, do not support the verdict of guilty of murder in the first degree, since, he says, they do not prove against him a murder committed in an attempt to rape, nor with express malice aforethought.

Preliminarily, we observe that the recited facts would not support a conviction of murder committed with express malice aforethought, the other facet of 11 Del.C. § 571, for the reason that there is no specific proof whatsoever of actions by Parson in the nature of premeditation, planning, deliberation, selection and use of a deadly weapon, or anything of that nature. Counts two and three of the indictment charge Parson with having killed Kathleen Rae Maull with express malice aforethought by either stabbing or by beating her. A conviction under either of these two counts based only upon the recited proof necessarily would be set aside.

The verdict of guilty of first degree murder must be upheld, however, if the evidence was sufficient to support such verdict under the first count of the indictment, i. e., that the defendant killed Kathleen Rae Maull while attempting to rape her.

The question before us, then, in this phase of the appeal is whether or not the recited facts support a conviction of murder in the first degree based upon the theory that the killing took place while Parson was at-

tempting to commit a rape upon Kathleen Rae Maull.

■ The State's case in the last analysis depends largely upon circumstantial evidence. Such being the case, the circumstances must be such as to be consistent only with a conclusion of guilt beyond a reasonable doubt. They must be such as to be inconsistent with any other reasonable conclusion. Holland v. State, 9 Terry 559, 107 A.2d 920.

We are of the opinion that the circumstantial evidence produced by the State admits of no other rational conclusion but that Parson killed Kathleen Rae Maull while attempting to commit rape upon her. We point to the mute evidence of what must have been a tremendous struggle—the bloodstained floor and walls of the Zak home; the clothes of the victim torn from her and thrown aside; the nose and upper jaw of the victim shattered by what had to be a massive blow; the finding on the kitchen floor of several teeth of the victim broken off by the blow which shattered her jaw; the abrasions and scratches on the victim's body caused by her body having been dragged along the ground; the terrific physical beating she had undergone, and the rupture of her hymen and the absence of semen which point to an unsuccessful attempt at intercourse.

All of these circumstances considered together are inconsistent with any conclusion other than that Kathleen Rae Maull was attacked in an attempted rape, resisted strongly, was badly beaten and was finally killed by a massive blow across the nose, which blow the presence of her teeth on the kitchen floor proves took place in the kitchen during the attempted rape.

What circumstances are there to connect Parson to this brutal crime? Considered as a whole, these, too, admit of no doubt that it was he who was the assailant. The presence of his car parked in front of the Zak home at the time the attack must have taken place raises at least an inference of his presence at the scene. Parson and Kathleen were of different blood groups, and both blood groups were found in the Zak kitchen. The presence of blood of Parson's blood group at the scene is readily explained by the freely bleeding cut on his right hand, assuming his presence on the scene Furthermore, on Parson's trousers was found blood of the victim's group, and blood of her group was also found in the back seat and trunk of Parson's car.

Among the pubic combings of Parson were found light brown pubic hairs similar to those taken from the body of Kathleen. Also found in the back seat and in the trunk of Parson's car were head and pubic hairs similar in characteristics to those taken from the body of Kathleen.

Admittedly, blood groups and samples of hair are not as positive in identification as are fingerprints, but at the very least, under the circumstances of this case, their presence together requires some explanation if they are not to connect the two individuals concerned. There is no such explanation in this record. Indeed, we think that in fact there could be no innocent one. This conclusion is strengthened by the fact that when he was first apprehended Parson knew what he was being apprehended for. He told the officers that "she" was not in the trunk of his car and directed them to the ditch where her lifeless body lay, telling the officers en route that she was dead.

■ We are of the opinion that the facts produced by the State, exclusive of Parson's confession, prove beyond a reasonable doubt that Kathleen Rae Maull was murdered during the course of an attempted rape upon her and that the perpetrator of the crime was Norman Benjamin Parson.

Another alleged error somewhat related to the foregoing is Parson's contention that error was committed in not instructing the jury in the precise language of State v. Opher, supra. The *Opher* case was that of a man charged with murder in the first degree on the theory that the killing had

taken place during an attempted rape of a thirteen-year-old girl. The evidence was that after the attempted rape had come to an end, the girl told her assailant that she would tell her mother what he had tried to do. She then ran off and the defendant shot and killed her as she fled.

The court instructed the jury that it should disregard the charge that the defendant had killed while attempting to commit a rape for any view of the evidence did not support the charge. In so instructing the jury, the court used the following language:

"It is not enough that the killing occurred soon or presently after the felony was attempted or committed. There must be such a legal relationship between the two that it can be said that the killing occurred by reason and as a part of the felony, to-wit: rape; *or that it occurred before the felony was at an end;* so that the felony had a legal relationship to the killing and was concurrent with it in part, at least, and a part of it in an actual and natural sense." [Emphasis supplied.]

Parson complains that in his instructions to the jury, the trial judge eliminated the emphasized clause in the charge from the *Opher* case, and that this was prejudicial error since, it is argued, that to find guilt under count one it must be established that the killing necessarily occurred before the attempt to rape was at an end.

We think, however, that Parson misreads the *Opher* case. In the first place, it is to be noted that the *Opher* charge is in the alternative, i. e., there must be a legal relationship between the killing and the attempted rape, *or* the killing must have occurred before the attempted rape was at an end.

■ Parson would change the "or" to "and" but this, we think, may not be done. Generally speaking, we think the law is that a killing so closely connected with an

attempted rape as to be fairly within the *res gestae* of the attempt is murder committed while attempting rape. It suffices if the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it or to conceal it. 1 Anderson, Wharton's Criminal Law and Procedure, § 252; 40 C.J.S. Homicide § 21.

■ We are of the opinion that no error was committed by the trial judge in refusing to include the emphasized clause in his instructions to the jury.

Next, Parson asserts that the trial judge's instructions defining malice twice made reference to inferences which might be drawn from the deliberate selection and use of a deadly weapon. The objection fundamentally is that there is no evidence whatsoever that Parson either selected or used a deadly weapon and that, accordingly, it was prejudicial to him to tell the jury of inferences which can be drawn from such a selection and use.

It is true that there is at least only slight evidence to justify any instruction as to the use of a deadly weapon. That evidence appears in Parson's confession concerning the struggle for possession of the butcher knife found at the scene of the crime. It is doubtful, however, that it could be said that there is any proof at all that Parson deliberately selected and used a deadly weapon. Indeed, in his confession he merely states that in the struggle for the knife he may have cut Kathleen.

■ We are of the opinion, however, that if it was error to instruct the jury upon the matter, that error at most was harmless error. We are of this opinion for the reason that, as we have already pointed out, the jury was justified under the evidence in finding Parson guilty under count one of the indictment. Under the circumstances, no prejudicial error can have occurred for the reason that under count one there was no requirement that the State prove express malice.

Next, Parson argues that his confessions[3] should not have been admitted into evidence because he was not warned prior to being questioned of his constitutional right to counsel and, in the event he could not retain counsel, to have counsel supplied to him by the State. It is argued that since his confession was obtained in violation of this constitutional right and was admitted into evidence, prejudicial error occurred which requires this court to reverse the conviction and grant a new trial. Cited in support are Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 and United States ex rel. Russo v. State of New Jersey, 3 Cir., 351 F.2d 429. It is admitted by the State that while Parson was warned of his right to remain silent and that anything he said would be used against him, he was not told of his right to counsel.

In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, it was held that the rule of the Escobedo case applies only to cases in which the trial began after June 22, 1964, and that the rule of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, elaborating on the Escobedo rule and specifically requiring that when the police investigation process shifts from investigatory to accusatory, the constitutional rights of the accused, irrespective of whether or not he has asked for counsel, require that he be told of his right to counsel and, if indigent, to be furnished with counsel, applies only to cases in which the trial began after June 16, 1966.

The trial of Parson began on January 11, 1965. Under the rule of the Johnson case, therefore, the rule of Escobedo is applicable, but the rule as expanded by the Miranda case is not applicable. Furthermore, the interpretation of the Escobedo rule made in the Russo case to the effect that failure to warn of the right to counsel prior to arraignment and, if

necessary, to supply counsel, is of no avail to Parson because the judgment in that case was vacated and the cause remanded to the District Court for further proceedings in the light of the Johnson case. 384 U.S. 889, 86 S.Ct. 1914, 16 L.Ed.2d 995. The result, therefore, is that we must apply the rule of the Escobedo case free of the gloss of the Miranda case.

The facts of the Escobedo case were that the defendant, after release from a prior arrest as a result of which he had obtained counsel, was rearrested and interrogated by police. During this interrogation he repeatedly requested that his counsel be present and, in fact, his counsel appeared at the police station and demanded to see his client. Despite all this, Escobedo was kept away from his lawyer until his confession was obtained. The Supreme Court of the United States held the confession was improperly obtained in violation of the 6th Amendment, should not therefore have gone into evidence, and reversed the conviction.

It is, of course, obvious that the situation in the case at bar differs materially from the factual situation in the Escobedo case, for at bar there was not a request for counsel by Parson. This case, therefore, does not fall precisely within the actual situation of the Escobedo case. Nor does the Escobedo case lay down in terms the absolute rule that when the investigating process becomes accusatory, the State must warn of the right to counsel.

It must be remembered that by Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, decided only thirty-five days before the Escobedo case, the rule was laid down that a defendant was entitled to the assistance of counsel after indictment. In view of the proximity of time, we think that the Escobedo case must be considered as having expanded the Massiah rule only to the precise factual situation upon which the Escobedo case was de-

---

3. The written confession of Parson describes in detail the crime.

cided. This conclusion is strengthened by the *Johnson* case which expressly denies retroactivity to the broad expansion of the *Escobedo* rule laid down in the *Miranda* case. The *Miranda* case applies to trials started after June 13, 1966, the date of the decision. We think our decision in King v. State, Del., 212 A.2d 722, is in line with this decision.

We hold, therefore, that Parson's confession was not obtained in violation of the 6th Amendment by reason of the failure of the police to warn him of his constitutional right to the assistance of counsel.

Parson argues further that his confession should have been excluded from evidence because it was involuntary and was not the product of his free will. It is argued that the fact that he had lost a great deal of blood when taken to the hospital and was in a state of shock; that he was given emergency treatment at the hospital; that his wound was closed by suturing; that he was given an injection of a sixth grain of morphine at 12:45 a. m., which would have effect for three or four hours; that he was detained at the hospital for two hours, and that he felt ill on the way to the police station and several times during his interrogation, coupled with his admittedly low intellectual level, demonstrates that at 4:30 a. m. when the taking of his written statement was commenced he was acting involuntarily.

In opposition, the State relies upon the testimony of the police officers to the effect that at all times Parson was rational and cooperative; that his confession was self-compulsive since he stated to them, when they warned him of his right to remain silent, that he had done a horrible thing and had to tell someone about it; that he was discharged from the hospital on the orders of a doctor who testified that Parson on discharge seemed normal and in complete possession of his faculties;

and that his written statement followed by four hours the injection of morphine.

All of these facts were brought out in a preliminary hearing on a motion to suppress the confession in the absence of the jury, after which the trial judge made a preliminary finding of admissibility. Thereafter, in the presence of the jury, the same facts were elicited. At the preliminary hearing and at the trial, Parson testified in substance that he had no recollection of his interrogation. The trial judge later instructed the jury that it was necessary for it to find whether or not the confession was voluntary and if it was found to be involuntary, to ignore it. Under these circumstances, this confession is not involuntary as a matter of law.

In a further effort to exclude the confession from evidence, Parson argues that it was obtained during an unlawful detention lasting from 11:30 p. m. on January 31, 1964 to 7:30 a. m. on February 1, 1964. Parson relies in this argument on McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed. 2d 1479, adopted by this court for Delaware by Vorhauer v. State, Del., 212 A.2d 886.

In the *Vorhauer* case, we held that any detention for more than a twenty-four hour period was unlawful as a violation of 11 Del.C. § 1911, and that, accordingly, a confession obtained as a result of such an illegal detention was inadmissible in evidence.

In Webster v. State, Del., 213 A.2d 298, we held that an inculpatory statement obtained during a detention of approximately four hours was admissible in evidence, and further that the reasonableness of a delay is a question of evidence to be determined by the trial judge, alone, relying upon Wilson v. State, 10 Terry 37, 109 A.2d 381, and Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908. Similarly, in

Lasby v. State, Del., 185 A.2d 271, 274, we held that a confession obtained as a result of a detention of slightly over five hours was not inadmissible as the product of an unlawful detention, the detention being reasonable under the circumstances.

██ In the case at bar the trial judge ruled that the period of detention was not unlawful. We affirm that ruling. A substantial part of the seven hours which elapsed was spent in locating the body of the victim and the subsequent treatment of Parson for his injuries. We cannot say as a matter of law that the period of detention was unreasonable.

██ Parson contends that by reason of a pre-trial ruling the defense was unduly limited in its use of the testimony of a psychologist and of a psychiatrist. This ruling resulted from a pre-trial application for the independent psychiatric examination of Parson. Two conditions were imposed: (1) that if insanity was to be pleaded as a defense, notice of that defense must be given the Attorney General, and (2) the testimony of the experts was to be limited to their opinions of Parson's mental capacity and level of intellectual achievement.

The pre-trial examination of Parson revealed that the defense of insanity under the McNaughton rules followed in this state, Longoria v. State, 3 Storey 311, 168 A.2d 695, could not be sustained and, accordingly, defense counsel notified the court of that result.

Prior to the hearing on the voluntariness of Parson's confession, his counsel requested that the full scope of the experts' finding should go into evidence as bearing on the issue of whether Parson was capable of forming a deliberate intent to kill, and also as evidence to be taken into account by the jury in deciding whether or not to recommend mercy. The trial judge ruled that such testimony would be excluded unless it supported the defense of insanity.

As a result, the examination of the experts by defense counsel was limited to their opinions of Parson's mental capacity and of his level of intellectual capacity. As a matter of fact, the only objection at the trial to enlarging the scope of the experts' testimony came from the defense during cross-examination by the State when that examination was tending toward eliciting testimony as to psychological and emotional factors possessed by Parson.

We think there is nothing in this record to support Parson's argument in this respect. No offer of proof was made so there is no indication of the nature of the testimony which would have been given in response to unlimited examination. The jury had before it the experts' opinion of Parson's mental level and capacity, and as far as is shown now this was the full extent of their findings. Under the circumstances there is nothing before us on which to act.

██ Finally, Parson argues that reversible error was committed by the denial of a change of venue. Rule 21(a) of the Criminal Rules, Del.C.Ann. requires a change of venue if the trial judge is satisfied that in the county where the charge is pending prejudice against the defendant exists to an extent that he cannot obtain a fair trial there. Such an application is made to the sound discretion of the trial judge and his action is subject to review solely for an abuse of discretion, 22 C.J.S., Criminal Law § 192; 21 Am.Jur.2d Criminal Law, § 427.

Certain things were done to insure in so far as possible that Parson would receive a fair trial; thus, no jurors were summoned from the general area where the crime took place, and extensive *voir dire* examination of all prospective jurors

was permitted and a number were excused for cause on the ground that they had formed an opinion as to guilt or innocence.

Parson argues, however, that newspaper coverage in advance of trial and steps taken by the court and police to insure the safety of Parson indicate that he could not obtain a fair trial in Sussex County.

■ We think, however, that not enough is shown to demonstrate an abuse of discretion on the part of the trial judge in denying a change of venue. The same newspapers which circulate in Sussex County circulate in all parts of the State, and we would suppose that the people of New Castle County were as cognizant of the crime as were those in Sussex County. Furthermore, the lapse of almost a year between the crime and the trial must have had the effect of lessening to some extent at least any angry reaction of outrage at this brutal crime. In any event, we think the refusal to grant a change of venue was not reversible error.

We hold, for all the reasons set forth in the foregoing, that there was no reversible error in Parson's trial.

The judgment below is affirmed.