**STATE of Delaware**

v.

**James E. COOKE, Defendant.**

**Crim. A. Nos. IN–05–06–1529 to IN–05–06–1533 and IN–05–06–2390 to IN–05–06–2394.**
**ID No. 0506005981.**

Superior Court of Delaware, New Castle County.

Submitted: Aug. 24, 2006.
Decided: Oct. 18, 2006.

280

Steve P. Wood, State Prosecutor, and Diane C. Walsh, Deputy Attorney General, Department of Justice, for State of Delaware.

J. Brendan O'Neill, and Kevin J. O'Connell, of Wilmington, DE, for the defendant.

## OPINION

HERLIHY, Judge.

Defendant James Cooke has moved to transfer his trial from New Castle County. That trial is scheduled to start with jury selection on January 23, 2007. He has been indicted for murder in the first degree (the deceased being Lindsey Bonistall), felony murder in the first degree (murder-rape of Lindsey Bonistall), rape first degree (Lindsey Bonistall), burglary first degree (Lindsey Bonistall's apartment), arson in the first degree (the apartment in which Lindsey Bonistall lived), reckless endangering first degree (relating to that apartment), burglary second degree (at the residence of Amalia Caudra), robbery second degree (Amalia Caudra), theft misdemeanor (involving Amalia Caudra), burglary second degree (the residence of Cheryl Harmon), and theft misdemeanor (involving Cheryl Harmon).

Bonistall was a University of Delaware student and was Caucasian. Cooke is African–American. Her death occurred around May 1, 2005. The burglary, robbery, and theft incidents involving Amalia Caucha occurred around April 30, 2005. The burglary and theft incident involving Cheryl Harmon occurred around April, 27, 2005.

To support his change of venue motion, Cooke has attached what he asserts are representative samples of news articles reporting on Bonistall's murder. The focus of his transfer motion is that murder and the related charges but not the other charges involving the other alleged victims. The articles in the Spring of 2005 report on the murder, security concerns on and around the University of Delaware campus, general concerns about crime in the City of Newark and police news conferences about the murder investigation.

Cooke was arrested for these offenses on June 8, 2005. Any articles reporting on his arrest were not included in the sampling filed with the current motion. He did attach an article between the dates of his arrest and that of his preliminary hearing and another one following that hearing. Much of that article was devoted to the DNA evidence which came out at the hearing.

### Parties' Claims

As representative samples, Cooke contends, the news articles show he cannot get a fair trial in New Castle County. His motion claims that a "climate of fear continued to hold its grip on the University of Delaware and Newark Communities." In addition, he claims, that the media attention with this case continues as public fascination with it has not subsided.

Cooke maintains the virtual saturation of media coverage during the last fifteen months has had a significant effect on the residents of New Castle County eligible to be chosen as jurors in this trial. In addition to the citing to and relying upon the news articles, he conducted a poll of 100 supposed possible jurors who are registered voters, the results of which he says indicated: 1) 35% of those polled already believed Cooke was guilty of the Bonistall murder; 2) 34% believed Cooke raped Bonistall; 3) 32% had formulated an opinion about what should happen in the case; and 4) 42% believed Cooke, definitely or probably, was guilty of the charged offenses.[1]

Cooke argues that the Court must consider various criteria such as: the nature of the publicity; the degree of circulation of the hostile publicity; the severity and notoriety of the charges; and the size of the community from which the jury will be drawn. He adds the Court should also consider the possibility of community bias because of his race and that of the victim Lindsay Bonistall, or both. He also contends that publication of important evidence in the case is to be considered by the Court in making its decision about transfer of the case in question. Cooke asserts the local media has flooded the jury pool with compelling DNA evidence implicating his guilt in the Bonistall rape and murder. As his final argument, Cooke points to what he says is the inflammatory nature of the publicity, the pervasive circulation of the hostile publicity, the severity and notoriety of the charges involved, and the relatively small size of New Castle County. Therefore, he submits, the only way he can get a fair trial by an impartial jury is to conduct the trial somewhere other than New Castle County.

The State answers that Cooke has the burden of proving he cannot obtain a fair

---

1. Defendant's motion, Exhibit N.

trial in New Castle County, the county in which the indictment was returned. It argues he has the burden of showing a reasonable probability of prejudice and that the prejudice was due to the pretrial publicity. It contends Cooke must present evidence of highly inflammatory or sensationalized pretrial publicity sufficient for the Court to presume prejudice. If he is not able to show inherently prejudicial pretrial publicity, the State argues Cooke must demonstrate actual prejudice through *voir dire.*

The State asserts that routine pretrial publicity in this case does not justify granting Cooke's motion for transfer. It assets the articles presented by Cooke are not sensationalized nor inflammatory, even if they are extensive. It asserts where, as here, news articles are largely informative, Cooke will not meet his burden of showing a presumption of prejudice in the venue. In addition, the State mentions the same newspapers circulate in New Castle, Kent and Sussex Counties and there is no reason to presume those in Kent County and/or Sussex County would be less aware of the facts of this case than individuals in New Castle County.

The State also postulates there is no showing potential jurors in Kent County and/or Sussex County would treat an African–American in a way other than the fair manner that he would be treated by potential jurors in New Castle County.

Concerning the poll Cooke had taken, the State argues there is no way to determine if the poll was or was not conducted subjectively or used scientific methods.

The State concludes Cooke has failed to demonstrate a reasonable probability of so great a prejudice that would compel this Court to transfer the trial outside New Castle County.

Cooke did not formally reply to the State's Answer, but in a letter attempted to clarify one aspect of the record. Concerning the polling, Cooke states the Office of the Public Defender obtained a complete list of registered voters with names and contact information. This list was then submitted to a random generator. To conduct the poll, staff went down the list sequentially, person by person, until one hundred responses were collected to the questions posed.

Cooke notes the State asserted he failed to contain the question as to whether the person being questioned was able to render a fair and impartial verdict. He maintains the question actually asked touches on the factual issues pertinent to his motion: "[b]ased on what you have read, seen or heard, if you were selected as a juror in this case, do you think you could be fair and impartial to both the prosecution and the defense?" [2]

### Applicable Standards

The Sixth Amendment of the United States Constitution and Article I, § 7 of the Delaware Constitution guarantee criminal defendants a trial by an impartial jury. Superior Court Criminal Rule 21 provides for a change of venue when a criminal defendant shows there is a "reasonable likelihood" of prejudice against the defendant. [3] Superior Court

2. Exhibit N: Telephone Surveyor's Script, Question 15.

3. (a) For prejudice in the county. The court upon motion of the defendant shall transfer the proceeding as to that defendant to another county whether or not such county is specified in the defendant's motion if the court is satisfied that there exists in the county where the prosecution is pending a reasonable probability of so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county.

(b) Transfer in other cases. For the convenience of parties and witnesses, and in the

Criminal Rule 21(a) requires a change of venue when a criminal defendant cannot obtain because of prejudice a fair trial in the county where the charge is pending.[4] Generally, a motion for change of venue will not be granted, as a matter of law, without some additional evidence showing the impossibility of seating an impartial jury.[5] A criminal defendant must show that there is a reasonable likelihood potential jurors were, in fact, prejudiced by the pretrial publicity.[6]

### Discussion

■ The decision to grant or deny a motion to change venue is a matter of discretion.[7] A change of venue is granted only when there has been a showing of reasonable probability of prejudice.[8] Routine pretrial publicity does not justify granting a motion for transfer of venue.[9] To make such a showing, Cooke must present evidence of publicity that is highly inflammatory or sensationalized for this Court to presume prejudice.[10] To determine whether there was prejudicial pretrial publicity sufficient to require a change of venue, the Court must look to the applicable news coverage to determine whether it was highly inflammatory and sensational.

To meet the burden required to obtain a change of venue, Cooke has proffered two things. One is a sampling of News Journal articles about this case and University of Delaware newspaper article from its web site. The other thing which he has presented, of course, is the results from a poll of New Castle County residents.

■ A review of the pre-trial publicity in this case starts with this proposition, "As a general rule, a defendant must show that potential jurors were prejudiced in fact by pre-trial publicity. (Citation omitted) Yet prejudice may be presumed when a moving party proffers evidence of highly inflammatory or sensational media coverage prior to trial." [11]

■ The review shows that the submitted articles were not either sensational or inflammatory. The specific articles to which Cooke points are these, identified by headline:

1. "U.D. Students Fear for Safety After Slaying" (Wednesday, May 4, 2005 front page).
2. "Surge in Crime frays nerves In Newark" (Thursday, May 5, 2005 front page).
3. "UD Students question housing security" (Friday, May 6, 2005 front page).

interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another county.
(c) Proceedings on transfer. When a transfer is ordered the prothonotary shall transmit to the prothonotary of the county to which the proceeding is transferred all papers in the proceeding and any bail taken, and the prosecution shall continue in that county.
Superior Court Criminal Rule 21.

4. *Parson v. State*, 222 A.2d 326, 335 (Del. 1966).

5. *McBride v. State*, 477 A.2d 174, 183 (Del. 1984).

6. *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645 6 L.Ed.2d 751 (1961).

7. *Parson v. State*, 222 A.2d at 335.

8. *McBride v. State*, 477 A.2d 174, 185 (Del. 1984).

9. *Id. at* 183.

10. *Irvin v. Dowd*, 366 at 728, 81 S.Ct. at 1645.

11. *McBride v. State*, 477 A.2d at 185 citing *Irvin v. Dowd, supra* and *Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

4. "A week after student's slaying, Newark adds more cops" (Tuesday, May 10, 2005 front page).

5. "UD tries to move beyond unsolved killing" (Saturday, May 28, 2005 front page).

6. "I want this maniac in jail" (Wednesday, June 1, 2005 front page).

7. "Evidence heard in robbery" (Thursday, June 16, 2005 front page).

8. "DNA odds pose hurdle for murder defendant" (June 23, 2005 front page).

9. "Public safety meeting set for Newark's District 1" (Saturday, July 16, 2005 page B–3).

10. "At start of new year, fear still resonates at UD" (Monday, August 29, 2005 front page).

11. "Evidence in slaying of UD student questioned" (Thursday, February 2, 2006, front page local section).

12. "PEACE OUTside campus events honor Bonistall" (Friday, April 28, 2006, Udaily).

13. "Newark apartments raising security measures" (Monday, July 1, 2006, page B–2).

The first article (May 4, 2005) mentioned that Bonistall had been strangled and her body left in a bathtub and reported on the fire and that there was a break-in. Most of the article relates to concerns for student safety, precautionary safety steps students should take, etc. The article on May 5th concerns several subjects besides the murder. One is the recent string of burglaries which are unrelated to this case, at least in that Cooke was not the perpetrator. Bonistall's murder is mentioned, with an additional detail about writing on the wall in her apartment. But, the article reports, the police declined to say what it was. Much of the article is devoted to discussions by Newark residents and City officials about the need for more police.

The article on May 6th mentioned briefly the same minimal detail of the murder but 90% of the article consists of comments by various people concerning security and security around the apartment complex where the murder took occurred. This article, as the one the day before had, showed a composite picture of the murder suspect.

The next article, May 10th, reported the vote by the Newark City Council to add more police. Most of the article relates to other crimes which had, a year before this case, sparked a debate to add more police. There are several references to Bonistall's murder, again with limited details, and this comment:

> Newark police Captain William Nefosky, who is overseeing the investigation said his office is, 'trying to limit what's said' to protect the investigation into Bonistall's death. Revealing what the killer scrawled on the walls could jeopardize chances of solving the murder, he said.

Cooke supplies a May 28, 2005 article about the University of Delaware trying to move past the murder. Again, there are bare details about the murder. The majority of the article consists of a few quotes from students about varying safety concerns, and what other colleges/universities are experiencing and doing about safety, etc.

On June 1st, the headline was "I want this maniac in jail." The quote is from Bonistall's father. Much of the article is about Bonistall and about her close relationship with her father. The article mentions that the killer is still at large. It repeats that the Newark Police are withholding details so as not to jeopardize the chances for an arrest.

The record shows Cooke was arrested for this murder on June 8, 2005. None of the articles supplied concern his arrest. He had a preliminary hearing on the Caudra burglary and robbery on June 15, 2005. The next article supplied is one from the June 16th paper about that hearing. It reports that Bonistall was raped and strangled. It mentions the proximity of the murder site to the matter heard at the preliminary hearing. The article reports that the State had not yet decided whether to seek the death penalty on the murder charge. Bonistall's father referred to Cooke as "complete sociopath." Most of the article, however, is about the Caudra case.

The preliminary hearing on the Bonistall murder/rape was June 22, 2005. There is a June 23rd article about it among Cooke's submissions. The headline and the first part of the article is about Cooke's DNA and overwhelming odds that the DNA recovered from the murder scene is his. The articles quotes one of Cooke's current counsel as saying, "It's a long way from over." There is some mention of the Caudra case. Yet, this article contains few details of the murder.

On July 16th the *News Journal* article, while mentioning the murder, is devoted primarily to Newark City Council members' comments on general public safety issues.

On August 29, 2005 the *News Journal* reported about the concerns returning students had concerning safety. The details of the murder are briefly stated. The bulk of the article, however, contains quotes from students and reports on what the University was doing about student safety and raising student consciousness of safety. It has safety tips and questions parents should ask about safety. There is even mention of national statistics relating to rapes involving female students.

The next exhibit among Cooke's submissions is a "Delawareonline" (*News Journal* web site) article reporting on the suppression hearing this Court held on February 1, 2006. The hearing was prompted by Cooke's motion to suppress and notes that Cooke is "targeting" (seeking to suppress) DNA evidence. There are quotes from Cooke's girlfriend's testimony at the hearing. It mentions Cooke is accused of raping and killing Bonistall. The write-up also mentions she was strangled and that her apartment was set on fire. Finally, it mentions that Cooke allegedly wrote "KKK" and "White Power" on the apartment walls.

Cooke's next media example is a printout of a University of Delaware web site piece of April 28, 2006. It reports on campus events honoring Bonistall. It mentions her murder but primarily it reviews the events occurring to honor her.

On July 31, 2006 the *News Journal* carried an article headlined, "Newark apartments raising security measures." The apartments in question are the ones where Bonistall lived and was murdered. Her murder, of course, is mentioned, but the bulk of the article relates to the security measures the apartment complex management is and would be undertaking.

The Court has recited in some detail the sample newspaper and internet web site articles Cooke has supplied. One reason is to portray the tone and emphasis of each article. Another reason is to discuss that tone and analysis as these are the print media articles on which Cooke's motion relies. And he noted, of course, that he was not proffering all the articles about this matter but that what he did proffer was representative of the *print* media coverage in order to make his point.

The Court has to assume that Cooke has proffered the articles that he contends es-

tablish that the print media coverage has prejudiced the potential jury pool or that there is sufficient media coverage to establish presumed prejudice. These representative articles he argues show an inflammatory or sensational coverage. Neither the content nor the tone do that, however. Cooke's print media showing falls short of meeting the standards needed to obtain a change of venue.

The reference to print media coverage is important. It must be observed that what Cooke has not offered is what the non-print media has said or shown. That is not a reflection on his motion, but if anything, a statement that such coverage has probably paralleled the content and tone of the print media. The Court will assume that there has been non-print media coverage of this case. That assumption leads to several comments. One is another assumption that the coverage of the case could have been equal to or more widespread in that persons who do not read the local paper or who may have missed one or more of these or similar articles, nevertheless, heard that coverage. Another reasonable assumption, particularly since nothing to the contrary has been offered, is that the non-print coverage has generally mirrored the print coverage in context and tone.

Cooke has to show in order to get a change of venue, that the media coverage has been inflammatory or sensationalized sufficiently for this Court to presume prejudice.[12] That standard also explains why the Court recited in some detail the articles Cooke supplied with his motion. Of course a rape and a murder by definition carry elements of sensation. But the coverage has not been inflammatory nor has it been sensational or *sensationalized*. It has been factual with minimal details, including in the early reporting that the police were withholding details to protect the integrity of the investigation. The only picture of Bonistall appearing in the print coverage is, apparently, her university school picture. There have been no pictures of the interior of the apartment, the walls with the writings, or the bathtub.

In short, the media coverage has been careful, straight forward and devoid of inflammatory or sensationalized language or tone. It has been commendably responsible. The Court, of course, hopes and expects that tone will continue in all the future media coverage of this case.

Contrasted to this case, years ago the case of Norman Benjamin Parson, an African–American man who raped and murdered a young Caucasian female, aroused a lot of attention in Sussex County and a lot of publicity. When reviewing the totality of news articles before, during, and after Parson's first trial and before his second, the District Court in a *habeas* proceeding said:

> "Nor does a review of the newspaper clippings indicate the existence of deeply felt local prejudice that might reasonably be thought to put in question the ability of the state to give [Parson] a fair trial." [13]

And the District Court concluded, with some parallels this case:

> When the state court proceeded to trial in Sussex County it had before it a case in which (1) the press had been responsible, (2) emotions had had five years to cool, (3) the state, with one unfortunate

---

**12.** *Dawson v. State,* 581 A.2d 1078, 1088 (Del. 1990).

**13.** *United States ex rel Parson v. Anderson,* 354 F.Supp. 1060, 1084 (D.C.Del.1972); aff'd 481 F.2d 94 (3rd Cir.1973), *certiorari denied* 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479 (1973).

exception in early 1968, had not generated the pretrial publicity, (4) the statewide circulation of the newspaper publicity provided no reason to believe that a transfer of venue to New Castle County would have accomplished anything and (5) the jury selection process had produced twelve jurors and two alternates who had neither significant knowledge about the case nor preconceived notions about the defendant's guilt or innocence. The trial court, in these circumstances, did not err in denying petitioner's motion for a change of venue.[14]

Of course no jury has been selected and there has been no "unfortunate exception" in this case (at least that has been brought to the Court's attention).

The coverage so far contrasts sharply with that found constitutionally demanding a venue change in *Irvin v. Dowd*.[15] Without repeating the inflammatory and sensationalized coverage reviewed in that case, there are still some comments worth quoting:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality

would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (citations omitted)[16]

Perhaps the most interesting quote from that is from Mr. Justice Frankfurter in his concurring opinion:

> For one reason or another this Court does not undertake to review all such envenomed state prosecutions. But, again and again, such disregard of fundamental fairness is so flagrant that the Court is compelled, as it was only a week ago, to reverse a conviction in which prejudicial newspaper intrusion has poisoned the outcome. (citation omitted). This Court has not yet decided that the fair administration of criminal justice must be subordinated to another safeguard of our constitutional system—freedom of the press, properly conceived. *The Court has not yet decided that, while convictions must be reversed and miscarriages of justice result because the minds of jurors or potential jurors were poisoned, the poisoner is constitutionally protected in plying his trade.* (emphasis added).[17]

The Court has reviewed the media coverage Cooke has submitted and determined it has not made the showing of prejudice or presumed prejudice to satisfy this Court that a change of venue is warranted. But he went beyond relying on that media coverage to do some polling. Cooke prefaces his polling submission in this way:

> The virtual saturation of media coverage during the fifteen months following the

---

14. *Id.*

15. 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

16. 366 U.S. at 722, 81 S.Ct. at 1642, 6 L.Ed.2d at 756.

17. 366 U.S. at 730, 81 S.Ct. at 1646–47, 6 L.Ed.2d at 760–761.

Bonistall homicide has had a significant effect upon the residents of New Castle County eligible to be chosen as jurors in this trial. A poll of one hundred eligible jurors revealed a high level of familiarity with the case. Many of the poll's participants have pre-judged the case, or at a minimum formulated opinions about the case. Of those polled, 89% responded affirmatively to the question of whether or not they had read about, seen or heard of this case. 35% of those polled indicated that they already believed that James Cooke was guilty of murdering Lindsay Bonistall. 34% believed hew as guilty of raping her. 32% had formulated an opinion about what should happen in the case. 42% believe that Cooke was either definitely or probably guilty of the offenses for which he had been charged, before a trial had even been conducted.[18]

The poll was of 100 people. Cooke summarizes the results as follows:

1. Do you live in New Castle County? 99% yes, 1% no.
2. Do you read the Wilmington News Journal? 81% yes, 19% no.
3. Do you watch the local television news? 87% yes, 13% no.
4. Do you listen to WILM, WDEL, WMRK and/or WVYD? 46% yes, 54% no.
5. Do you visit any internet sites which cover local news? 40% yes, 60% no.
6. Have read about, seen or heard of Lindsey Bonistall? 35% yes, 60% no, 5% not sure/no opinion?
8. Have you read about, seen or head of James Cooke? 31% yes, 67% no, 2% not sure/no opinion.
10. Have you read about, seen, or heard of a case in which a Newark man was accused of breaking into the apartment of a University of Delaware student, raping her, killing her and setting her apartment on fire? 89% yes, 10% no, 1% not sure/no opinion.
12. Based you what you have read, seen or heard, do you think James Cooke is guilty of murdering Lindsey Bonistall? 35% yes, 2% no, 63% not sure/no opinion.
13. Based on what you have read, seen or heard, do you think Mr. Cooke is guilty of raping Lindsey Bonistall? 34% yes, 0% no, 66% not sure/no opinion.
14. Based on what you have read, seen or heard, do you have any thoughts about the James Cooke case? 35% yes, 46% no, 19% not sure/no opinion.
15. Based on what you have read, seen or heard, if you were selected as a juror in this case, do you think you could be fair and impartial to both the prosecution and the defense? 68% yes, 19% no, 13% not sure/no opinion.
16. Do you think it is wrong that James Cooke be permitted to raise psychiatric issues in his defense? 31% yes, 55% no, 24% not sure/no opinion.
17. Based on what you have read, seen or heard, do you have any opinion about what should happen in the case? 32% yes, 48% no, 20% not sure/no opinion.
18. Mr. Cooke is African–American and Lindsey Bonistall is white. If you were a juror in this case, would that fact have any effect on your ability to be fair and impartial to

---

18. Defendant's opening brief, paragraph 10.

both sides? 1% yes, 96% no, and 3% not sure/no opinion.

19. Which, if any, of the following choices best describes your position regarding the Cooke case, based on what you have read, seen or heard?

 a. He is definitely guilty. 12%

 b. He is probably guilty. 30%

 c. He is definitely not guilty. 0%

 d. He is probably not guilty. 0%

 e. I cannot really say. 59% [19]

The State notes that Cooke does not give details of how the poll was conducted or the randomness of those responding to the questions. It argues that the pollers did not ask if the person polled could render a fair and impartial verdict based on the evidence.

 The Court is unconvinced that the poll results, independently or in conjunction with the media coverage (both supplied in Cooke's exhibits and any non-print media coverage) has established the kind of or the presumption of the kind of prejudicial pretrial publicity that should lead to a change in venue. There are a number of reasons.

Some of those reasons are found in the poll results:

67% have never head of Cooke.

63% have no opinion or are not sure he is guilty of murdering Bonistall. That's close to the 59% who could not really say he is guilty (Question 19).

69% said that if selected as a juror they could be fair and impartial.

96% said that his race and Bonistall's race would not affect their ability to be impartial.

These results, even if gross, indicate there is a large pool of potentially impartial persons from which to select the jury in this case. As the Delaware Supreme Court said, potential jurors do not have to be totally ignorant of the case:

> Prior knowledge of the facts and issues of the case, even a preconceived notion of guilt or innocence, will not automatically disqualify a prospective juror 'if the juror can lay aside his (sic) impression or opinion and render a verdict based on the evidence in court.' *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961); *Dutton v. State*, Del.Supr., 452 A.2d 127, 137 (1982).[20]

Another reason for the unpersuasiveness of the poll is that there are 434,033 eligible possible jurors in New Castle County.[21] In *Irvin v. Dowd* the population in the Indiana County where the six murders were committed was 30,000 and the Supreme Court described it as rural. While some of New Castle County remains, for the moment, rural, its population in 2005 is 505,271 [22] and it cannot be described as primarily rural. Newark's population in 2000 was 28,547.

In addition, each prospective juror is placed under oath and asked questions based on this statute:

> When a juror is called in a capital case, the juror shall be first sworn or affirmed

---

19. Defendant's opening motion, Exhibit O.

20. *Dawson v. State*, 581 A.2d 1078, 1090 (Del. 1990); *accord Hughes v. State*, 490 A.2d 1034, 1040 (Del.1985).

21. Some, of course, in this number have served in the last two years and would be disqualified, or cannot speak and understand English, etc. The remaining number of qualified potential jurors, however, remains large. Further, this number not only includes registered voters, but persons who have drivers' licenses or state identifications but who are not registered voters.

22. 2005 Census figures.

upon the voir dire and then asked, under the direction of the court, if the juror has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If the answer is in the negative, the juror shall be sworn as a juror in the case, unless the juror has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant, or unless the juror shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If the juror's answer to the question be in the affirmative, the juror shall be disqualified to sit in the case, unless the juror shall say, upon oath or affirmation, to the satisfaction of the court, that the juror feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event the juror shall be a competent juror, if not otherwise disqualified, challenged, or excused.[23]

■ This alone, of course, is not the exclusive test.[24] Without meeting the reasonable likelihood test to change venue now, the engine for insuring an impartial jury will be an individualized and searching *voir dire*.[25]

■ Further, the University of Delaware is an institution which draws students from all over Delaware. The *News Journal* has a statewide circulation. The Court does not have before it any samples of articles from the *Delaware State News* which has a primarily Kent and Sussex counties circulation. And the trial in this case is scheduled to start about 20 months after the murder. These, too, are factors in weighing the publicity and the role of the publicity in the decision to or not to change venue.

All of the above, the media coverage the polling results and everything this Court cites demonstrates that Cooke has not made the requisite showing to warrant a change of venue.

### *Conclusion*

For the reasons stated herein, defendant James Cooke's Motion to Transfer is **DENIED.**

---

23. 11 *Del. C.* § 3301.

24. *Parson,* 222 A.2d at 335–36.

25. *Dawson v. State,* 581 A.2d 1078, 1090 (Del. 1990), *reversed other grounds* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).