# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | Cr. ID No. 0104015882 |
| | ) | |
| CHAUNCEY STARLING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Upon Defendant's Motion for Postconviction Relief – DENIED**

Submitted: May 30, 2014
Decided: August 28, 2014

James J. Haley, Jr., Esquire, Wilmington, Delaware; Stephen H. Brose, Esquire, David M. Fragale, Esquire, Jeremy D. Engle, Esquire, Emily B. Nestler, Esquire, Sarah R. Lamoree, Esquire, of Steptoe & Johnson LLP, Washington, District of Columbia. Attorneys for Defendant.

Elizabeth R. McFarlan, Esquire, Maria T. Knoll, Esquire, and Karen V. Sullivan, Esquire, of Delaware Department of Justice, Wilmington, Delaware. Attorneys for the State of Delaware.

**Rocanelli, J.**

On March 9, 2001, at 8:30pm, Darnell Evans, an adult, and Damon Gist Jr., ("DJ") a five-year old child, were killed by gunshots at the Made 4 Men Barbershop ("Barbershop") on Fourth Street between Market and Shipley Streets in Wilmington, Delaware. There were numerous other people in the Barbershop. Several witnesses heard gunshots and saw the shooter. None of the witnesses identified the shooter by name. Although ballistics testing identified the weapon used, no gun was ever recovered. No DNA or fingerprint evidence was recovered.[1]

According to witnesses, the shooter opened the door of the Barbershop and shot at Evans. Evans ran to the back of the Barbershop. The shooter followed him, stood over him, and shot him twice in his head. As a result of five gunshot wounds to the head, chest, abdomen, and groin, Evans died. Sometime during the shooting, DJ had been shot in the head and died as a result of this gunshot wound.[2]

At trial, the State relied heavily upon the testimony of Alfred Gaines who testified that he, Starling, and Richard Frink were driving around on the day of the shootings. According to Gaines, when they drove past the Barbershop, Frink saw Evans. Gaines relayed the following facts: Frink and Starling discussed whether Evans was "the guy," but they did not explain what this meant. Frink asked if

---

[1] Senten. Dec. at 5, *State v. Starling*, No. 0104015882.
[2] *Id.* at 4-5.

Starling was going to do anything and Starling testified that he would "put in some work." Gaines testified that this meant shooting or fighting someone. Frink parked the car in the block between Market Street and Shipley Street outside of the Barbershop. Starling got out and tucked a gun into his pants. Starling was wearing all dark clothes, including a black hooded sweatshirt. Starling then walked in the direction of Market Street while Frink and Gaines stayed in the car. Fifteen to twenty minutes later, Starling returned to the car and said to Frink, "I got him. I got him. I think I got a little boy, too."[3]

At the time of the shooting, Shaylynn Flonnory, Evans's girlfriend, was outside the Barbershop and saw someone dressed all in black, holding a gun. According to Flonnory's statements before trial, the shooter's face was covered, with openings for his eyes. When she testified at trial, Flonnory stated that the eyes of Defendant, Chauncey Starling, matched those of the gunman she saw outside the Barbershop. Flonnory also testified that the gunman was wearing a black hooded sweatshirt.

Gaines also testified to the following facts: Later on the evening of the shooting, Starling called Gaines at 10:04pm, saying Starling wanted to talk. Gaines took a taxicab to meet Starling at the home of Vicki Miller, who was Starling's girlfriend. Gaines testified that when he met with Starling, Starling

---

[3] *Id.* at 6-7.

looked upset and mentioned shooting the young boy. Then, Starling's brother, Michael, entered the room and Starling told Michael that Starling was drunk, stupid, and sorry for what he had done. Michael later relayed this statement to the police during an interview.[4]

In November of 2001, a grand jury indicted Starling and his co-defendant, Frink. Starling was charged with two counts of murder in the first degree, two counts of possession of a firearm during the commission of a felony, and one count of conspiracy in the first degree. The trials were severed.

John S. Malik, Esquire ("Trial Counsel") represented Starling at trial. On October 24, 2003, a jury convicted Starling on each count of the indictment. The jury unanimously agreed on the existence of three statutory aggravating circumstances[5] and unanimously recommended the death penalty on November 4, 2003. Starling was sentenced to death on June 10, 2004, for the murders of Darnell Evans and DJ Gist (two death sentences).

In Starling's direct appeal, the Delaware Supreme Court affirmed Starling's convictions, but vacated his death sentences and remanded the case to the Superior

_____

[4] *Id.* at 7-8.
[5] 11 *Del. C.* § 4209(e)(1)(i), (k), (s). The aggravating circumstances were: (1) the defendant was previously convicted of another felony involving the use or threat of violence; (2) the defendant killed two or more people and the deaths were a probable consequence of such behavior; (3) the victim was under the age 14 and the defendant is at least four years older than the defendant. *Id.*

Court for resentencing.[6] In the Superior Court on October 2, 2005, Starling was resentenced to two death sentences. The death sentences were affirmed in a second appeal to the Delaware Supreme Court.[7]

In April 2007, Starling filed three motions for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 as a self-represented litigant. Court-appointed ("Rule 61 Counsel") filed an Amended Petition for Postconviction Relief on April 1, 2008. Since the 2008 filing, the parties have submitted numerous amended petitions and responses and the Court has held numerous hearings. Most recently, the Court held oral argument on March 28, 2014 to address the claims of prosecutorial misconduct by Rule 61 Counsel. Supplemental briefing was completed on May 30, 2014.

Motions for postconviction relief are governed by Superior Court Criminal Rule 61. As the moving party on a postconviction motion, the defendant bears the burden of proof.[8] Rule 61 does not establish which burden of proof must govern, nor has Delaware case law articulated the specific burden. It is clear, however, that

---

[6] *Starling v. State*, 882 A.2d 747, 760 (Del 2005).
[7] *Starling v. State*, 903 A.2d 758, 767 (Del. 2006).
[8] *Younger v. State*, 580 A.2d 552, 555 (Del. 1990).

a petitioner must establish that he has been deprived of a "substantial constitutional right before he is entitled to any [postconviction] relief."[9]

---

[9] *Id.*

**I. STARLING'S CLAIMS OF *BRADY* VIOLATIONS ARE PROCEDURALLY BARRED**

The *Brady* rule demands that the prosecution disclose exculpatory evidence to the defense.[10] Starling claims that the State failed to disclose exculpatory evidence when the State withheld information that Trial Counsel could have used to impeach Gaines; information that implicated another person committed the crimes; and for failing to disclose witness Vicki Miller's statement. However, a claim of a *Brady* violation cannot be made for the first time in a postconviction proceeding. The Court finds these claims are procedurally barred under Rule 61(i)(3).

*Starling's claims that the State withheld information necessary to impeach Gaines is procedurally barred under 61(a)(3).*

With respect to information to impeach Gaines, the Court finds this claim is procedurally barred under Rule 61(i)(3). The record reflects that Starling's claim of a *Brady* violation regarding information to impeach Gaines was never presented at trial or on Starling's direct appeal. Despite the procedural bar, the Court addresses this claim on the merits below.

*Starling's claim that the State withheld information regarding other suspects is procedurally barred under 61(i)(3).*

Starling argues that the State did not provide evidence that would tend to establish that another person committed the crimes. For instance, before the police

---

[10] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

investigated Starling, the police attempted to question Bruce Stewart for the shootings and at the scene of the crime;[11] two witnesses told police that Stewart was the shooter. The State claims it had no evidence that Stewart committed the murders. Instead, police questioned Stewart's whereabouts at the scene of the crime because victim Evans and Stewart had recently been indicted for an unrelated crime. Police initially theorized that Evans might have been murdered to prevent him from testifying against Stewart.

The Court finds this claim procedurally barred under Rule 61(i)(3). The record reflects that Starling's claim of a *Brady* violation regarding information that other people were suspected of the crimes was never presented at trial or on Starling's direct appeal.

*Starling's claim that the State withheld information from Vicki Miller is procedurally barred under Rule 61(i)(3).*

Gaines told the police that following the shootings, Gaines, Starling, Michael Starling, and Vicki Miller all met at Miller's home. Gaines also stated that in the presence of those people, Starling admitted to shooting DJ. When the police attempted to corroborate Starling's statement with Miller in an interview, Miller stated that Starling had never made such a comment and the only thing Starling said was in reference to a news report about the shooting.

---

[11] The Wilmington police even worked with the television show *America's Most Wanted* to attempt to capture Stewart.

7

Starling argues that he was prejudiced without this information because Trial Counsel was unable to call Miller as a witness to refute Gaines' story that Starling said he was sorry in front of Gaines, Michael, and Miller about shooting the little boy. Starling asserts that this was particularly prejudicial because the jury also repeatedly heard the police say that Miller corroborated Starling's story when the State played Michael Starling's interview with the police.

Starling notes that Trial Counsel's motion for a new trial based on this allegedly withheld information was denied and Starling appealed the issue to the Delaware Supreme Court.[12] Starling argues, however, that this claim is not barred because the portion of the statement being raised here is distinct from the issue previously addressed. Starling contends that the Court only ruled on Miller's statement that she could not recall whether Starling was at her home on the night of the shootings and did not consider Miller's statement about Starling merely saying that the person should be caught.

The State counters that Trial Counsel knew of the entirety of Miller's statement and thus there was no *Brady* violation. Miller was not an unknown witness to Starling, but instead she was Starling's girlfriend and was available as a

---

[12] *Starling*, 882 A.2d at 756.

witness.[13]  Trial Counsel admitted to the Court that he had an opportunity to interview Miller before trial and thus the State asserts that there is no *Brady* violation when the Defense had equal access to Miller.[14]  Moreover, the State argues that even if this issue was not addressed by the trial court, it is procedurally barred because Starling did not raise it on direct appeal.

With respect to Miller's statement, the Court finds this claim procedurally barred under Rule 61(i)(3).  The Court is satisfied that Miller's statement in contention here is distinct from Miller's statement previously litigated such that Starling's claim is not barred under Rule 61(i)(4).[15]  However, this claim is procedurally barred under Rule 61(i)(3) because the record reflects that it was never presented at trial or on Starling's direct appeal.  Moreover, Starling's argument that Trial Counsel could not call Miller as a witness is without merit. Miller, Starling's girlfriend, was an available witness and Trial Counsel had the opportunity to interview her before trial.  Accordingly, Starling has failed to meet his burden of establishing prejudice, the third requirement of a valid *Brady* violation claim.

---

[13] *State v. Starling*, I.D. No. 0104015882, Mem. Op. at 22, Herlihy, J. (Del. Super. Apr. 26, 2004).

[14] *Id.*

[15] Super. Ct. Crim. R. 61(i)(4) provides a procedural bar for any claim that was previously adjudicated at trial, on appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding.

## II. THE STATE DID NOT VIOLATE *BRADY* WITH RESPECT TO GAINES AS A TRIAL WITNESS

The Delaware Supreme Court has held that a defendant must satisfy three elements to establish a *Brady* violation: (1) the evidence in contention must be favorable to the defense, "either because it is exculpatory, or because it is impeaching;" (2) the State must have suppressed such evidence either inadvertently or willfully; and (3) prejudice must have resulted from the suppression of the evidence.[16] Under the third prong, the State's duty to disclose is only applicable where the evidence is relevant to the defendant's guilt or punishment.[17]

For *Brady* purposes, evidence is relevant if it tends to prove someone else committed the crime or someone else had equal motive to commit the crime.[18] In order to reverse a conviction based on a *Brady* violation, the petitioner must "show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[19] Therefore, a *Brady* violation cannot serve as the basis to overturn a conviction where "the untainted

---

[16] *Atkinson v. State*, 778 A.2d 1058, 1063 (Del. 2001).
[17] *State v. Comer*, 2007 WL 313574, at *4 (Del. Super. Feb. 2, 2007).
[18] *Id.*
[19] *Jackson v. State*, 770 A.2d 506, 516 (Del. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 415, 455 (1995)).

evidence of guilt [is] overwhelming."[20] Moreover, as noted above, these claims are procedurally barred unless Starling can demonstrate: (1) "cause for relief from the procedural default" and (2) "prejudice from violation of the movant's rights."[21] In the absence of any such evidence, the Court concludes that this claim is without merit.[22]

Any evidence that may be used to impeach a prosecution witness must be disclosed under the *Brady* rule.[23] The Delaware Supreme Court has held that "the dropping of a charge against a state's witness is clearly relevant to the issue of bias" and "falls within the *Brady* rule."[24] The Delaware Supreme Court has also noted: "Whenever the State reduces any pending charges (related or not) or makes any arrangement with any State witness, disclosure is mandatory."[25] Starling asserts that the State failed to provide various pieces of information in violation of the *Brady* rule.

First, Starling alleges the State did not reveal to Trial Counsel the role the Delaware Department of Justice ("DDOJ") played in the discharge of Gaines'

---

[20] *Michael v. State*, 529 A.2d 752, 757 (Del. 1987); *Jackson*, 770 A.2d at 512 (holding that there was untainted evidence of guilt where there was a shoe print analysis, handwriting and fingerprint analysis, and the defendant's letter admitting guilt).
[21] Super. Ct. Crim. R. 61(i)(3)(A)-(B).
[22] *Compare Hainey*, 945 A.2d at 1167 (Del. 2008) (holding that where defendant failed to raise a prosecutorial misconduct claim at trial or on direct appeal it was procedurally barred).
[23] *Jackson*, 770 A.2d at 515; *Michael*, 529 A.2d at 756 (citing *Giglio v. United States*, 405 U.S. 150 (1972)).
[24] *Michael*, 529 A.2d 752, 756 (Del. 1987) (citing *Van Arsdall v. State*, 524 A.2d 3 (Del. 1987)).
[25] *Id.*

11

Delaware probation. The Barbershop shootings occurred on March 9, 2001. On April 7, 2001, Starling shot Gaines in Chester, Pennsylvania. Starling asserted self-defense in connection with this shooting. Gaines was found with a bag of crack cocaine in his possession and was on probation at the time in Delaware for a prior misdemeanor assault charge. Following the discovery of cocaine, Gaines' probation officer recommended that probation be revoked and Gaines be sanctioned.

On October 17, 2001 Gaines' violation of probation was dismissed and his capias was withdrawn. According to the State, there was no deal between the State and Gaines. The Court accepts the representations of the prosecutors who emphatically disclaimed that there was any deal with Gaines and stated firmly that no promises had been made to Gaines in exchange for his testimony. Gaines was never extradited back to Delaware, but instead was released from the custody of Pennsylvania. Gaines was not required to come to Delaware because of safety concerns related to Starling's shooting of Gaines.

Starling argues that Gaines was a biased witness and that Trial Counsel did not have the opportunity to fully disclose Gaines' bias to the jury. According to Starling, Gaines received a benefit for testifying against Starling. Had the State provided this information, Starling asserts, Trial Counsel would have been able to impeach Gaines, who was the State's key witness.

Nevertheless, disclosure was not mandated because Trial Counsel knew that Gaines had been on probation at the time that Starling shot Gaines and also knew that Gaines' probation had been discharged. Trial Counsel had conducted his own research into Gaines' criminal and probation history. Also, the timing of Gaines' discharge from probation strongly suggests there was no relationship between that and Gaines' testimony. Specifically, the probation was discharged in October 2001 and the trial occurred two years later, in October 2003. Furthermore, the probation was for a misdemeanor assault conviction and it would have been highly unusual for such a probation term to be extended for several years during the pendency of an unrelated trial.

Most importantly, it would have been highly prejudicial to allow the jury to consider the events related to the circumstances of the alleged probation violation. The cocaine found by police was discovered in Gaines' possession after Gaines was shot by Starling. Indeed, any disclosure at Starling's trial for two other gunshot murders would have harmed Starling's capital case. There was no prejudice to Starling by failing to reveal this information to the jury. To the contrary, Trial Counsel properly avoided making this presentation to the jury which would have implicated Starling in another shooting. Indeed, Trial Counsel and the State agreed not to mention the Chester shooting, which led to Gaines' violation of probation because if the Chester shooting was mentioned at trial, then

Starling's involvement in the Chester shootings would also have been mentioned. Therefore, Trial Counsel not only was aware of the discharge of the violation of probation, but specifically chose as a part of Trial Counsel's strategy not to question Gaines about the violation or the Chester shooting. This was sound trial strategy.

Further, even if this *Brady* claim was not procedurally barred, Starling has failed to demonstrate prejudice that would put the "whole case in such a different light as to undermine confidence in the verdict."[26] Impeaching Gaines on bias grounds may not have been helpful or important for Starling's case to demonstrate that Gaines was acting in self-interest when he chose to testify. Moreover, Trial Counsel's cross-examination of Gaines required a delicate balancing. Finally, Gaines was released from probation two years before trial occurred, which was for Gaines' safety, not in exchange for his testimony at trial, which was two years later.

Given the very serious nature of the allegations by Rule 61 Counsel and the statements made in briefing related to allegations of prosecutorial misconduct related to Gaines' testimony, the Court scheduled an additional hearing and granted the opportunity for supplemental briefing so that Rule 61 Counsel might provide record support for the contention that the DDOJ played a role in the

---

[26] *Jackson*, 770 A.2d at 516.

probation discharge for Gaines, and also failed to disclose their role to Trial Counsel. Despite these opportunities to supplement the record for the Court's consideration, Rule 61 Counsel has not provided any record support for these very serious allegations of prosecutorial misconduct. The Court concludes that the DDOJ did not play any role in the discharge of Gaines' probation. Moreover, the Court concludes that the prejudicial effect of revealing this information to the jury substantially outweighed any benefit Starling might have received by impeaching Gaines. Finally, it would have been entirely inconsistent with Trial Counsel's sound trial strategy to discuss the shooting of Gaines by Starling in Chester, Pennsylvania. Therefore, even assuming *arguendo* that the claims are not procedurally barred, there was no violation of *Brady*.

## III. STARLING'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Ineffective assistance of counsel may arise during the trial phase and/or during the sentencing phase. There is a two-pronged test to establish ineffective assistance of counsel.[27] First, the movant must show, by a preponderance of the evidence, that counsel's representation fell below an objective standard of reasonableness.[28] When evaluating the conduct of counsel, there is "a strong

---

[27] *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).

[28] *Strickland*, 466 U.S. at 687-88; *Wright*, 671 A.2d at 1356.

15

presumption that [counsel's conduct] was professionally reasonable."[29] Mere allegations will not suffice to prove ineffective assistance of counsel. Instead, a defendant must make concrete allegations of ineffective assistance of counsel and substantiate them.[30] Second, the movant must establish that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.[31] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[32] When a death sentence is challenged, the question is "whether there is a reasonable probability that, absent the errors, the sentence [including an appellate court, to the extent it independently reweighs the evidence] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[33]

## A. Trial Counsel's Pretrial Representation Was Effective

Starling claims ineffective assistance related to Trial Counsel's representation during the discovery phase. Specifically, Starling argues that Trial Counsel was ineffective with respect to Trial Counsel's failure to seek pre-trial discovery of taxicab records and phone records from the night of the shooting. The

---

[29] *Gattis v. State*, 697 A.2d 1174, 1178 (Del. 1997); *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990); *Delaware v. Miller*, 2013 WL 4135019, at *2 (Del. Super. July 25, 2013).
[30] *See Younger*, 580 A.2d at 556.
[31] *Strickland*, 466 U.S. at 694; *Wright*, 671 A.2d at 1356.
[32] *Strickland*, 466 U.S. at 694.
[33] *State v. Sykes*, 2014 WL 619503, at *13 (Del. Super. Jan 21, 2014) (citing *Strickland*, 466 U.S. at 695).

State contends that Trial Counsel's actions were objectively reasonable and that Starling was not prejudiced by Trial Counsel's failure to obtain this evidence. When counsel fails to investigate facts, the determination of prejudice will depend on whether the expected evidence would have changed the outcome of the trial.[34]

After the shooting, Gaines testified that he took a taxi from his mother's home to Miller's home to speak with Starling. Gaines testified that Starling said, "God was going to forgive [Starling] for killing the little boy."[35] There was no corroborating evidence that Gaines took a taxicab to Miller's home as Gaines had asserted. Starling argues that Trial Counsel was ineffective for failing to issue a subpoena to the taxi company for its records and failing to interview any taxi drivers to challenge Gaines' testimony. The State argues that Starling cannot demonstrate prejudice from Trial Counsel's failure to subpoena taxi records. Particularly, the State notes that a detective called the taxi company and was told that cash customer logs are routinely destroyed after seven to ten days. Accordingly, Starling could not have been prejudiced because the information was not available.

Starling has not demonstrated ineffective assistance of counsel with respect to the discovery of the taxicab records. Starling has not established that Trial

---

[34] *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).
[35] Def. Amend. Mot. for Postconviction Relief at 29.

Counsel's failure to subpoena taxicab records fell below an objective standard of reasonableness.[36] Because the records did not physically exist, it was not unreasonable to refrain from requesting records where such. Moreover, the availability of this information would not have changed the outcome of the trial.

Next, Starling argues that Trial Counsel was ineffective during the pretrial phase because certain phone records would have yielded exculpatory evidence. Trial Counsel originally filed a motion to compel Frink's phone records, but the motion was withdrawn by Trial Counsel. The only phone records that the State produced prior to trial were Starling's cell phone records for March 2001.[37] Rule 61 Counsel eventually received the cell phone records of Frink after the Court's ruling on Starling's motion for postconviction discovery.[38] Starling argues that this new information can establish that Starling answered Frink's phone calls during the time of the shootings, which would be inconsistent with someone actively engaged in committing murder.

The State argues that it provided Starling with relevant telephone records pre-trial and that the newly produced records do not establish that Starling answered his phone during the time of the shootings. Moreover, the State asserts

---

[36] *Strickland*, 466 U.S. at 687-88.

[37] When Trial Counsel requested all phone records in the State's possession or control, the State asserted it was only obligated to produce evidence it intended to use at trial. The Defense argues that in refusing to produce discoverable materials, the State also violated the Rules of Criminal Procedure. *See* Super. Ct. Crim. R. 16 (a)(1)(C).

[38] *See State v. Starling*, 2010 WL 2861824 (Del. Super. July 20, 2010).

that, even if the Defense could show that Starling answered his phone, it does not show that Starling did not commit the shootings.

With respect to the phone records, Starling has not established that Trial Counsel's withdrawal of the motion to compel discovery fell below an objective standard of reasonableness.[39] Evidence that Starling answered his cell phone very shortly after the time of the shootings does not establish that Starling did not also commit the shootings and are therefore not dispositive of whether Starling committed the crimes. The availability of additional phone records would not have changed the outcome of the trial.

## B. Trial Counsel's Trial Strategy Was Effective

Counsel's strategic choices are presumed reasonable and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[40] Effective assistance of counsel may be provided in various ways and counsel's obligation is to "make the adversarial testing process work in the particular case."[41] To overcome the presumption that counsel's actions were sound trial strategy, the petitioner must establish that: (1)

---

[39] *Strickland*, 466 U.S. at 687-88.
[40] *Strickland*, 466 U.S. at 689.
[41] *Id*. at 690.

the strategy, even if sound, did not in fact motivate counsel; or (2) the strategy could never be considered sound.[42]

*A Change of Venue for Starling's Trial Was Not Required*

Starling asserts that Trial Counsel was ineffective when he did not request a change of venue. Starling argues that Starling's jury could not be impartial as a result of the pre-trial publicity surrounding the case. Starling contends that the pre-trial publicity created a reasonable likelihood of prejudice requiring a change in venue. The State argues that trial counsel's choice not to seek a change of venue was reasonable because the media attention had dwindled by the time of the trial, which was more than two years after the shootings. Also, the State emphasizes that a large pool of jurors were interviewed and screened. The State contends that Starling was not prejudiced by the publicity.

Criminal defendants are guaranteed a trial by an impartial jury by the Sixth Amendment of the United States Constitution and Article I, Section 7 of the Delaware Constitution.[43] A change of venue may be provided when a criminal defendant shows there is a reasonable likelihood of prejudice against the defendant.[44] In Delaware, a motion for change of venue will generally not be

---

[42] *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005).
[43] U.S. Const. amend. VI; Del. Const. art. I, § 7.
[44] Super. Ct. Crim. R. 21(a).

20

granted unless the evidence of prejudice against the defendant is so substantial "that the defendant cannot obtain a fair and impartial trial" in the county where he has been charged.[45] Routine publicity does not warrant a change in venue[46] and defendant must show publicity that is "highly inflammatory or sensational" or that actually caused prejudice.[47]

With respect to the challenge to venue, Starling has not established ineffective assistance of counsel. Starling has not shown that Trial Counsel's failure to request a change of venue fell below an objective standard of reasonableness or that Starling was prejudiced because of this alleged failure. Two hundred jurors were summoned and interviewed, and many were eliminated due to personal or media contacts with the case. Starling's jury was properly polled and Starling's *voir dire* process screened the jury pool for pre-existing prejudice.

*Trial Counsel was effective in not objecting to Flonnory's in-court identification of Starling when Trial Counsel had the opportunity to cross-examine Flonnory on that issue*

Starling argues that Flonnory's in-court identification of Starling as the shooter was impermissibly suggestive because there was no doubt that Flonnory understood that Starling was the defendant. Starling asserts that when Trial Counsel failed to suppress or object to the identification at trial, Trial Counsel was

---

[45] *Id.*; *see also State v. Cook*, 910 A.2d 279, 283 (Del. Super. 2006).
[46] *Cook*, 910 A.2d at 283.
[47] *Id.*

ineffective because there was ample opportunity for Trial Counsel to object prior to when Flonnory made the identification and there was no reasonable trial strategy for Trial Counsel's failure to object. Flonnory had not mentioned the shooter's eyes prior to trial and Trial Counsel expressed that he did not object out of surprise of the testimony and he simply did not think to do so.[48]

The State argues that although Trial Counsel was surprised by Flonnory's identification, Trial Counsel had the opportunity to cross-examine Flonnory in order to mitigate any damage and elicit other weaknesses in the identification.[49] The State asserts that it was sound trial strategy for Trial Counsel address the identification with Flonnory during cross-examination. According to Starling, cross-examination of Flonnory was not a substitute for the identification that had already been made, especially where Flonnory was the only witness identification.[50]

---

[48] Malik 1/9/13 Tr. At 109:5-8 (testifying that it was a "legitimate point" but "I didn't think of it at the time. And I suppose I could have renewed that application, but I didn't think of it at the time.").

[49] For instance, Flonnory admitted: she had not mentioned the shooter's eyes to the police after the shootings, she could not articulate any unique distinctions in the shooter's eyes that prompted her identification, she only saw the shooter for seconds, and she never identified Starling in other lineups.

[50] *See United States v. Emanuele*, 51 F.3d 1123, 1132 (1995) (concluding that the defendant was prejudiced by an unreliable in-court identification where identity was the critical issue and no physical evidence linked the defendant to the crime).

22

Starling has not demonstrated ineffective assistance in Trial Counsel's response at trial to Flonnory's in-court identification of Starling as the shooter. Even though Trial Counsel concedes that he did not object to the identification merely out of surprise rather than strategy, Starling has not established that Trial Counsel's representation fell below an objective standard of reasonableness.[51] Trial Counsel cross-examined Flonnory regarding her identification and elicited information which could have placed doubt onto the credibility of Flonnory's identification. Furthermore, Starling has not demonstrated prejudice sufficient to undermine the outcome of his trial.[52] If Trial Counsel objected to the identification or moved to suppress it, there remains a reasonable likelihood that the Trial Court would have admitted the identification and that Starling still would have been found guilty considering other evidence of Starling's guilt.

*Counsel's trial strategy with respect to witnesses Clifford Henry and Lawrence Moore was effective.*

Starling contends that Trial Counsel failed to hire an investigator to interview two witnesses, Clifford Henry and Lawrence Moore, and that Trial Counsel failed to utilize information received from the State regarding these witnesses. First, Trial Counsel did not call Clifford Henry, the barber who cut Evan's hair on the night of the shootings, to testify at trial. Starling argues that

---

[51] *Strickland*, 466 U.S. at 687-88.
[52] *Id.* at 694.

Henry would have testified that police claimed Bruce Stewart was the shooter when they arrived at the scene of the crimes, that everyone present in the Barbershop looked toward the sound of the first gunshot to contradict Flonnory's testimony that she looked into the shooter's eyes when he entered the Barbershop, and that the shooter was a man of large stature and was over five feet and eleven inches tall, significantly taller than Starling.

Second, Starling argues that Trial Counsel failed to elicit exculpatory evidence from Lawrence Moore, the Barbershop owner who testified that he watched the entire crime and chased after the shooter after the shooter fled the Barbershop. Although Trial Counsel cross-examined Moore, Starling alleges that Trial Counsel did not elicit all relevant information because Moore would have testified that the police suspected Bruce Stewart of the crime and that the shooter was significantly taller than Starling. Starling also alleges that Moore would have testified that he saw pictures of suspects to the shootings in the newspaper and none of them resembled the shooter he saw on the evening of the crimes.

In response, the State contends that Starling has failed to clearly establish any prejudice which may have resulted from Trial Counsel's alleged errors. The State notes that there were a number of witnesses at trial who testified to varying

heights of the shooter and more testimony on the issue would not have changed the outcome of the trial.[53]

Counsel was not ineffective in his refusal to call Henry at trial and in his cross-examination of Moore at trial. Starling has not demonstrated that Trial Counsel's failure to call Henry as a witness or elicit more detailed testimony from Moore establishes that Trial Counsel's representation fell below a level of objective reasonableness. There is no requirement that Trial Counsel elicit all possible evidence at trial.

Furthermore, Starling has not demonstrated actual prejudice. Starling has failed to establish how Henry and Moore's testimony would have altered the outcome of Starling's trial. There has been no showing that Henry's testimony would have convinced the jury that Flonnory's testimony was falsified. Additionally, the jury heard various pieces of testimony on the height and stature of the shooter. Accordingly, Starling has failed to establish how Henry and Moore's testimony would have altered the jury's perception of the shooter's body type in a way that would have produced a different trial outcome.

---

[53] For instance, one witness, a barber, testified that the shooter was 5'8'' or 5'9''. The owner of the Barbershop testified that the shooter was 5'11". On cross-examination, Moore testified that he told an investigator that the suspect was approximately 6'1" or 6'2". Gist Sr. testified that the shooter was 5'11" or 6". Flonnery testified that the shooter was 5'7" to 5'9" tall. St. Ans. Amend. Mot. for Postconviction Relief.

*Trial Counsel's introduction of the recorded Michael Starling statement did not rise to the level of ineffective assistance of counsel.*

One month after the shootings, the Wilmington police interviewed Michael Starling, Starling's half brother. One detective admitted that the interviewing detectives threatened Michael with imprisonment and falsely told Michael that Starling had confessed to the shootings.[54] Two hours into the interrogation, Michael stated that Starling said that Starling "was sorry about the little boy." Trial Counsel introduced the recorded interrogation at trial. The recording included Michael's statement identifying Starling as the shooter and the detectives' statements.

Starling asserts that Trial Counsel failed to seek exclusion of the taped interview of Michael where it was overly prejudicial and unreliable because a licensed audio engineer testified at trial that there were "continuity problems" with the tape because there were seven "stop/start" events during the course of the recording. Starling also asserts that Michael's statement was involuntary, coerced, and Trial Counsel should have objected to its introduction.[55]

---

[54] Detective Mullins admitted this at the November 2012 evidentiary hearing.

[55] Starling notes the following: Michael was surprised by a "hallway full of police" at his work who then forced him to go with them to the police station; Michael was never given his *Miranda* rights; he was interrogated for two hours after he stated that he was not at Miller's house on the night of the shootings; the police told Michael what to say, and when he did not say it, they threatened to charge him with double murder; during the interrogation, the police yelled and banged on the table and Michael cried and begged to speak to his mother.

The State responds that Trial Counsel's failure to object to the introduction of the interview was objectively reasonable and Starling has failed to establish that the outcome of the trial would have been different had Trial Counsel objected. The State also argues that this claim is meritless considering Trial Counsel admitted the tape into evidence himself to demonstrate that Michael's statement was coerced and that the tape was unreliable.

Starling has failed to establish ineffective assistance of counsel in Trial Counsel's use of the Michael Starling interview tape. Starling cannot argue that Trial Counsel was ineffective for failing to object to the introduction of the tape when Trial Counsel introduced the tape himself. Trial Counsel's representation was not objectively unreasonable because Michael's taped interview permitted the jury to consider the credibility of Michael's confession, thus providing potentially exculpatory evidence for Starling.

## C. Starling's Ineffective Assistance of Counsel Claims at Sentencing Phase

*Trial Counsel's presentation of mitigating evidence was effective.*

Starling claims that Trial Counsel was ineffective for failing to obtain and present mitigating evidence at sentencing. In investigating the availability of mitigating evidence to be presented at sentencing, defense counsel is required to

"conduct a thorough investigation of the defendant's background."[56] However, "there is no duty for defense counsel to pursue all lines of investigation about potentially mitigating evidence."[57] Instead, counsel has the liberty to choose which mitigating factors will persuade the jury to not impose death.[58] Competency does not require an attorney to present every witness who can present mitigating evidence.[59]

Starling argues that Trial Counsel was ineffective for failing to interview and obtain testimony from Starling's biological father because meeting his biological father had a profound impact on Starling's life and was a contributor to Starling's delinquency. Starling also claims that Trial Counsel was ineffective for failing to have Starling psychologically tested and failing to obtain testimony from those who treated or evaluated him, which could have explained evidence of Starling's possible antisocial personality disorder. Moreover, Starling argues that Trial Counsel should have obtained Starling's school records, which would have established Starling's history of mental deficiencies. In response, the State asserts that Trial Counsel was not required to present all mitigating factors and Trial Counsel provided sufficient mitigating evidence. Particularly, the State notes that Trial Counsel provided evidence that Starling's biological father was absent for

---

[56] *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting ABA Guidelines).
[57] *Flamer v. State*, 585 A.2d 736, 757 (Del. 1990).
[58] *Id.*
[59] *Id.*

28

most of his life and that Starling suffered from mental limitations due to fetal alcohol spectrum disorder and mixed learning disorders.

The Court finds that Trial Counsel's representation did not fall below an objective level of reasonableness. Trial Counsel provided mitigating factors which included Starling's background, family, and mental/cognitive deficits. Objectively reasonable representation did not require Trial Counsel to call every possible witness to establish mitigating evidence. Moreover, even if additional witnesses were called to testify, there remains a significant likelihood that the jury would have recommended death, especially where the jury had already heard very similar mitigating evidence. The State also notes the following: (1) Trial Counsel presented mitigating evidence on Starling's behalf and urged the jury to consider it in sentencing; (2) the State mentioned Starling's mitigating factors in its closing argument when it requested the jury sentence Starling to death despite the those mitigating factors; and (3) Starling presented an allocution to the jury.

*Trial Counsel acted properly in refraining to object to mitigation, burden of proof, and reasonable doubt jury instructions during sentencing*

Starling asserts that the Court erred in providing clear and correct jury instructions at sentencing and Trial Counsel was ineffective for failing to object to the instructions. In response, the State contends that the jury instructions were consistent with state and federal law and, therefore, it was not ineffective when

trial counsel did not object. If a trial judge's jury instructions are "reasonably informative and not misleading by common standards of verbal communication" they are not a basis for reversal.[60]

Starling argues that the Court erred in its instructions in describing the definition, weight, and standard of proof of the mitigating factors. In its instruction, the Court stated that, "[a] 'mitigating circumstance' is any factor relating to the crime or to the offender which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate."[61] Starling claims that this definition of mitigation was improper because its effect was to undermine any factor that does not make it "inappropriate" to impose death. Starling argues that mitigation should encompass all evidence relating to the defendant's character or background that might tend to provide a basis for a sentence other than death. Furthermore, Starling contends that the phrase "relating to the crime or to the offender" implies that the mitigation must only be related to the offense; however, other aspects of a defendant's background can be considered.

In the mitigation instruction, the Court also stated that,

> In weighing the aggravating and mitigating circumstances, it is not a question of mere numbers of each, but rather, the relative weight of each as compared

---

[60] *Mills v. State*, 732 A.2d 845, 849 (Del. 1999).
[61] Senten. Hrg. Transc. 1-2 (Nov. 4, 2003).

> to the others . . . [Y]ou do not have to unanimously agree that a particular mitigating [factor] has been established in order for you to individually consider such a mitigating circumstance.[62]

Starling argues that this instruction was improper because the assessment should not have been "the relative weight of each" mitigating circumstance as compared to the aggravating circumstances. Instead, Starling asserts that there should be a balancing of the totality of all the mitigating circumstances against the totality of all the aggravating circumstances and Trial Counsel's failure to object to these instructions was ineffective.

The State responds that the mitigation instructions were consistent with state law, and therefore Starling was not prejudiced by them nor was Trial Counsel ineffective for failing to object. The Court finds Starling's claims of ineffective assistance of counsel with respect to the jury instruction about mitigating evidence to be without merit. Starling has failed to establish ineffective assistance of counsel where the instructions properly reflected Delaware law and were otherwise informative and not misleading.

Next, Starling argues that the Court erred in its instruction to the jury on the standard of proof when considering its sentencing decision. Although the jury was instructed to determine whether the aggravating circumstances outweighed the

---

[62] Senten. Hrg. Transc. 110 (Nov. 4, 2003).

mitigating by a preponderance of the evidence in accordance with Delaware law,[63] Starling arues that the Delaware Code violates Starling's Sixth, Eighth, and Fourteenth Amendment rights. Starling contends that because the sentencing process is inherently fact-finding, it should be subject to a beyond a reasonable doubt standard and Trial Counsel was ineffective for failing to object to this standard.

Starling's claim regarding the standard of proof jury instruction is procedurally barred and without merit. First, this claim is barred because Starling challenged it on direct appeal and the Delaware Supreme Court has ruled on this claim, finding that Delaware's dual step capital sentencing procedure is proper under the Sixth Amendment.[64] Second, this claim is without merit. The jury instructions were in accord with Delaware law and, therefore, proper.

Finally, Starling argues that the Court's definition of "reasonable doubt" as defined in the jury instruction was in violation of Starling's due process rights and that Trial Counsel was ineffective when he failed to object to such instructions. Particularly, Starling contends that the instructions failed to inform the jury that reasonable doubt can arise from both evidence presented and any absence of evidence. The State asserts that the Court was not required to give instructions in a

---

[63] 11 *Del. C.* § 4209(c)(3)(2).
[64] *See* Super. Ct. Crim. R. 61(i)(4); *see also Starling*, 882 A.2d at 756-57.

particular format and, therefore, there was no error. The State also argues that Starling has not argued, nor demonstrated that he was prejudiced by the instruction.

It is well-established Delaware law that the burden of proof instructions need not be in a particular format as long as the instructions convey the accurate burden. The Delaware Supreme Court has held that the "United States Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt."[65] As long as the jury instructions convey the concept of reasonable doubt, they are not flawed.[66] Accordingly, it was not objectively unreasonable for Trial Counsel to concede to such instructions during Starling's trial.

## IV. STARLING'S CONSTITUTIONAL CLAIMS

*Starling's claims of denial of his right to attend his own sentencing hearing is procedurally barred under Rule 61(i)(3).*

Starling argues that his United States and Delaware constitutional rights were violated when Starling was allegedly denied an opportunity to attend his sentencing hearing. Starling requested a continuance because the hearing was scheduled during Ramadan, and Starling did not attend. Starling is a practicing

---

[65] *Mills v. State*, 732 A.2d at 850.
[66] *Holland v. United States*, 348 U.S. 121, 140 (1954).

Muslim and was observing Ramadan during sentencing and Starling claims that attending the hearing would have breached his religious obligations. Instead of attending the hearing, he viewed it via video from a lock-up area so that he could pray at designated times.

The United States Supreme Court has held that a criminal defendant's right to be present at all "critical stages of the trial" is fundamental.[67] Delaware also recognizes a defendant's right to be present at trial and sentencing; however, this right can be waived in two instances.[68] First, the right to presence is waived when the defendant is voluntarily absent after the trial has commenced.[69] Second, the right to be present is waived when, after being warned of his disruptive conduct that he will be removed, the defendant's disruptive conduct persists.[70]

Starling argues that the two instances of waiver permitted under Delaware Superior Court Criminal Rule 43 are not applicable to Starling. First, Starling contends that he was not voluntarily absent, but rather he was compelled to be absent because of his religious obligations. Second, Starling was not removed due

---

[67] *Rushen v. Spain*, 464 U.S. 114, 117 (1983).
[68] Super. Ct. Crim. R. 43.
[69] Super. Ct. Crim. R. 43(b)(1). It does not appear that there is case law which addresses whether a religious conflict constitutes voluntary absence. *See, e.g.*, *Walls v. State*, 850 A.2d 287 (Del. 2004) (defendant was voluntarily absent when he disappeared mid-trial without explanation); *see also Thomas v. State*, 2004 WL 300444 (Del. Super. Ct. Feb. 9, 2004) (defendant was voluntarily absent when he refused to be present unless the judge overruled his order limiting the number of witnesses).
[70] Super. Ct. Crim. R. 43 (b)(2).

to disruptive behavior. Moreover, Starling claims that Starling was severely prejudiced because of his absence and notes that the Court explained to Starling that "there is a risk that [his] absence from most of this proceeding may be harmful."[71] Therefore, Starling claims that Trial Counsel was ineffective because he did not move for a continuance of the hearing date.

The State argues that procedurally defaulted bars this claim unless Starling can demonstrate cause for his default and actual prejudice because Starling failed to raise this claim on direct appeal.[72] The State notes that Trial Counsel was not ineffective in proceeding with the scheduled sentencing hearing because Starling himself failed to raise this concern to Trial Counsel until two days before Ramadan began. The Court gave Starling the option of attending the penalty hearing, absenting from the hearing completely, or staying in the holding area next to the courtroom with audio and video feed and contact with his counsel before cross-examination of all State witnesses. The Court informed Starling of the potential negative impact in not attending his own hearing, but he chose to only attend the State's closing argument and his allocution. Moreover, the State notes that the Court explained that Starling had a constitutional right not to attend and during Starling's allocution, Starling explained that he was not in attendance due to religious obligations.

---

[71] Def. Amend. Mot. for Postconviction Relief at 84.
[72] *See* Super. Ct. Crim. R. 61(i)(3), (5).

Starling's claim that he was improperly denied an opportunity to attend his sentencing hearing is procedurally barred under Rule 61(i)(3). Starling failed to present this claim on his direct appeal and thus it is barred unless Starling can demonstrate: (1) "cause for relief from the procedural default" and (2) "prejudice from violation of the movant's rights."[73] Starling has failed to demonstrate both cause and prejudice. Starling was able to mitigate any alleged prejudice by viewing the hearing from another room, consulting with Trial Counsel about State witnesses, and explaining that he was not present because of religious reasons during his allocution.

*Starling's claims of prosecutorial misconduct are procedurally barred under Rule 61(i)(3).*

Starling argues that the prosecution engaged in various instances of misconduct which prejudiced the trial and violated Starling's right to due process, a fair trial, and a reliable sentencing hearing. Because of seriousness of sentencing in a capital case, the prosecutor has a heightened duty. In capital cases, a prosecutor has a "duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices."[74]

First, Starling asserts that the prosecution engaged in misconduct when it produced Flonnory's in-court identification on the day of trial where no notice was

---

[73] Super. Ct. Crim. R. 61(i)(3)(A)-(B).
[74] *Lesko v. Lehman*, 925 F.2d 1527, 1541 (3d Cir. 1991).

given to Trial Counsel.  Second, according to Starling, the State allegedly refused to provide discovery, which Starling alleges should have included the cell phone and taxicab records.  Third, Starling contends that the State improperly relied on evidence not in evidence throughout its closing.  Fourth, Starling argues that the State asserts that it elicited Gaines' testimony because Gaines was upset about the death of the child; however, Starling argues that the State knew Gaines was lying and was actually motivated by an unrelated event in which Starling shot Gaines in self-defense.  Fifth, Starling contends that the understanding was that Gaines was only to testify that Starling, Frink, and he were in the car together on the night of the crimes; therefore, the State either failed to disclose additional facts to the Defense or the State elicited Gaines' story for the first time at trial.

The State argues that the Starling's claims of prosecutorial misconduct are procedurally barred because they were not raised at trial or on direct appeal.[75] Moreover, the State contends that the claims of prosecutorial misconduct lack merit.  The State, in response to the Defense's argument that the State failed to provide discovery, urges that there was no misconduct considering that Trial Counsel did not request the telephone records in his motion to compel. Additionally, the State asserts that the Defense had an opportunity to cross-

---

[75] *See* Super. Ct. Crim. R. 61(i)(1); *see also* Super. Ct. Crim. R. 61(i)(3).

examine Gaines and did so thoroughly so as to elicit any deficiencies in his testimony.

Starling's claims of prosecutorial misconduct are procedurally barred under Rule 61(i)(3) because the claims were never presented at trial or on direct appeal. Therefore, these claims are procedurally defaulted unless Starling can demonstrate: (1) "cause for relief from the procedural default" and (2) "prejudice from violation of the movant's rights."[76] In the absence of any such evidence, the Court concludes that Starling's prosecutorial misconduct claims are without merit.[77] Starling has not demonstrated cause or prejudice resulting from the alleged prosecutorial violations.

## V. STARLING'S CHALLENGE TO THE DEATH SENTENCE UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS

Starling claims that that his death sentences violate his constitutional rights under the Eighth and Fourteenth Amendments because Delaware's statutory aggravating factors fail to narrow the class of persons eligible for the death penalty. Starling also argues that Delaware's death penalty statute enumerates too many aggravating factors that the statue does not narrow the pool of offenders eligible for the death penalty.[78] This argument is without merit. The Delaware

---

[76] Super. Ct. Crim. R. 61(i)(3)(A)-(B).
[77] *See e.g. Hainey v. State*, 945 A.2d 1167 (Del. 2008) (holding that where defendant failed to raise a prosecutorial misconduct claim at trial or on direct appeal it was procedurally barred).
[78] 11 *Del. C.* § 4209(e)(a)-(v).

Supreme Court has previously reviewed similar claims and has held Title 11, Section 4209 of the Delaware Code constitutional.[79]

## VI. STARLING'S CLAIMS REGARDING CUMULATIVE EFFECT OF ERRORS

Where one error, standing alone, does not merit basis for reversing a conviction, cumulative error may.[80] However, harmless errors, even when cumulative, remain harmless when there is no actual prejudice.[81] Finally, Starling argues that even if one individual claim does not merit relief, the cumulative effect of the errors merit relief under Rule 61. The State responds by arguing that Starling has failed to allege harmless error or actual prejudice, and thus reversal is unwarranted.

With respect to Starling's claim of cumulative error, the Court finds this claim without merit. The Court is not convinced that Starling has been denied any of his constitutional rights so as to warrant reversal of his convictions or his sentences.

---

[79] *State v. Cohen*, 604 A.2d 846, 850 (Del. 1992);
[80] *See Wright v. State*, 405 A.2d 685, 690 (Del. 1979).
[81] *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007).

NOW, THEREFORE, this 28th day of August, 2014, the Defendant's Motion for Postconviction Relief is hereby DENIED.

IT IS SO ORDERED.

*Andrea L. Rocanelli*

_____

**The Honorable Andrea L. Rocanelli**